Rule 23 order filed
December 13, 2018.
Motion to publish granted
December 27, 2018.

2018 IL App (5th) 170228

NO. 5-17-0228

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| MARIANELA WILLIAMS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 13-D-200 |
| | ) | |
| DAVID WAYNE WILLIAMS, | ) | Honorable |
| | ) | Julia R. Gomric, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE OVERSTREET delivered the judgment of the court, with opinion.
Justices Welch and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    The respondent, David Wayne Williams, appeals from a judgment that granted the petitioner, Marianela Williams (Nela), permission to move from Illinois to North Carolina with the parties' minor children pursuant to section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/609.2 (West 2016)). On appeal, David asks us to review the circuit court's finding that the relocation was in the children's best interests. In addition, David challenges the circuit court's denial of his request for more visitation/parenting time with the children, the lower court's award of attorney fees and costs to Nela as sanctions against him, and the court's award of retroactive child support. For the following reasons, we affirm.

1

¶ 2                                    BACKGROUND

¶ 3      David and Nela were married on September 29, 2001, and had two daughters during their

marriage, S.W., who was born in November 2002, and M.W., who was born in December 2006.

S.W. has been diagnosed with mild Asperger's syndrome.

¶ 4      The circuit court entered a judgment dissolving the marriage on May 23, 2014, awarding

both parties the joint custody, care, and control of the children with Nela as the primary

residential custodian. The circuit court granted David overnight visitation with the children on

Wednesdays and every other weekend and set out a holiday and summer visitation schedule. The

court awarded Nela, among other things, rehabilitation maintenance of $1400 per month for 24

months; child support in the amount of $2002.56 per month; 50% of the marital portion of

David's military pension, which equaled to approximately $300 a month income for Nela; and a

share in the equity of the marital home. David was required to sell or refinance the home and pay

Nela her share of the equity. The parties entered into a joint parenting agreement that

incorporated the terms of the circuit court's judgment with respect to custody and visitation. The

agreement provided that Nela could not remove the minor children from the State of Illinois

without the circuit court's permission.

¶ 5      On David's request, the parties later agreed to change David's weekday-overnight

visitation from Wednesday nights to Thursday nights because one of the daughters had dance

class on Wednesday nights. David testified that he wanted his visitation on a night that neither

child had activities so he could spend time with both daughters.

¶ 6      After the parties' divorce, Nela became engaged to Benjamin Baumer (Ben), who lives in

North Carolina and works as an accountant earning approximately $90,000 annually. Ben has

two sons from a prior marriage and has custody of his sons every other weekend. On March 3,

2015, Nela filed a petition pursuant to section 609 of the Marriage Act (750 ILCS 5/609 (West 2014)), seeking permission from the circuit court to remove S.W. and M.W. from Illinois to North Carolina.[1] At the time of the filing of the petition, S.W. was 12 years old, M.W. was 8 years old, and both David and Nela lived in O'Fallon, Illinois.

¶ 7    In her petition, Nela alleged that she was unemployed, that she was not in a position to obtain lucrative employment because she had been out of the workforce caring for the children, that she was the sole caretaker of the children, and that she did not have extended family in Illinois to assist her with raising the children. She alleged that, with the assistance of Ben's family in North Carolina, she could seek employment or educational opportunities or obtain skills that would improve her chances of lucrative employment. She alleged that removal of the children to North Carolina was in the children's best interests because their quality of life would be better "as they [would] reside in a more luxurious home than they currently do in O'Fallon, Illinois"; they would be afforded additional time with their future stepsiblings and stepgrandparents, who live in North Carolina; the area where she would reside in North Carolina had more resources such as cultural events, day care, community centers, and schools than what was available in O'Fallon, Illinois; and the children would attend public schools "with a five star rating." Nela alleged that any parenting time that David lost could be made up during the summer months, extended weekends, and school vacations. David objected to Nela's request to move the children to North Carolina.

¶ 8    On October 8, 2015, David filed a motion pursuant to section 607(c) of the Marriage Act (750 ILCS 5/607(c) (West 2014)), requesting the court to modify his visitation/parenting time by

---

[1]While Nela's removal petition was pending, the legislature amended the Marriage Act by adding section 609.2, which sets out factors the circuit court shall consider when a parent requests permission to relocate with a child (750 ILCS 5/609.2 (West 2016)). In the present case, the circuit court applied section 609.2 in deciding Nela's petition.

awarding him more time with the children. David alleged that he lived in close proximity to Nela, that they had been able to cooperate with pick-ups and drop-offs, and that the children would benefit from "substantially equal time between both parents' homes as both parents are actively involved in the day to day lives of the minor children including assisting with and attending extracurricular activities of the minor children, assisting the minor children with their homework and transporting the minor children to/from school and other functions."

¶ 9    In December 2015, Nela married Ben while her petition to relocate was still pending. The marriage resulted in the early termination of David's obligation to pay Nela maintenance.

¶ 10    Over David's objection, the circuit court granted Nela's request to appoint a guardian *ad litem* (GAL) to represent the children's interests in the proceedings. The circuit court then appointed Elaine LeChien to serve as the children's GAL. In order to prepare a report for the court, LeChien spoke with Nela, David, the children, Ben, and Ben's ex-wife. At that time, S.W. was seeing a counselor, Sheri Miller, and LeChien also spoke to Miller.

¶ 11    While the petitions were pending, David's relationship with S.W. developed issues after an incident in which David disciplined S.W., and S.W. then refused to have any overnight visits with him. Miller began counseling sessions with David in an effort to help David with parenting S.W. in light of her mild Asperger's syndrome and to help repair his relationship with S.W.

¶ 12    On July 6, 2016, LeChien filed a report of her findings. She noted that, at that time, S.W. was not having overnight visits with David and that David was going to counseling sessions with Miller. LeChien added that she did not know whether S.W. would ever be ready to go back to overnight visits in David's home. She noted that it was "a very difficult situation for the girls, as well as their parents. Nela would like to move on with her new life. David would like to hold onto his life the way it is now." LeChien concluded that the relocation should not take place at

4

that time. She believed that, before relocation, it was important for S.W. and David to continue to work on their relationship and that S.W. finish the eighth grade.

¶ 13 On April 25, 2017, LeChien updated her report after additional telephone conversations with Miller, attending David's and Nela's depositions, and additional meetings with the children. LeChien wrote in her report that it appeared that David and S.W. had repaired their relationship and that S.W. had resumed overnight visits at David's home. She noted that David and the girls had traveled to the east coast for a week-long vacation together. She also noted that Nela had supported the mending of S.W.'s relationship with David.

¶ 14 Based on her investigation, LeChien concluded that Nela was the primary caretaker for the children and was responsible for their day-to-day care, both during the marriage and after the divorce; that Nela would be happier in North Carolina with her husband and would have more employment opportunities; that the girls would benefit from the living environment in North Carolina; and that the girls would have ample opportunities to visit with David after they moved. LeChien, therefore, concluded that the relocation should be granted. She recommended that David have parenting time at least once per month on three-day school breaks, spring break, which, she noted, was at least a week long in North Carolina, Thanksgiving each year, and part of Christmas break. She recommended that David have parenting time six to eight weeks of the summer break depending on the school calendar and that Nela have three weeks of parenting time during the summer break to allow the children to vacation with their mother.

¶ 15 On April 26, 27, and 28, 2017, two years after Nela filed her petition, the trial court conducted a three-day hearing on Nela's request to relocate the children to North Carolina and

on David's motion to modify visitation/parenting time.[2] At the time of the hearing, S.W. was 14 years old and had finished the eighth grade, and M.W. was 10 years old and had finished the fourth grade. At the hearing, the parties presented evidence concerning whether relocating the children to North Carolina was in the children's best interests. Much of the evidence focused on the extent of Nela's and David's involvement in the girls' daily lives, the extent of the support Nela had in Illinois in caring for the children, and how a move to North Carolina might impact the girls' lives positively and negatively as well as its impact on their relationships with each parent.

¶ 16    Nela testified that she did not believe that her moving to North Carolina with the children would impact the girls' relationship with David because their relationship was "very, very strong," he would have longer visitation periods, and he would be able to communicate with the girls from Illinois with technology such as FaceTime and Skype. She testified that she would do "everything possible to make sure he could see them and be with them as much as possible." She agreed that there would be changes since David would not see them weekly, but she did not believe that the changes would have a negative impact on their relationship with each other. She stated that David and the children loved each other and that they would all have a good time when they were together.

¶ 17    Nela testified that David took the girls to many activities in the St. Louis area, including Six Flags, the City Museum, Forest Park, and the Muny. She acknowledged that David and the girls do a lot of fun activities together. She testified that her time with the children during the week was more scheduled because of homework and extracurricular activities. She acknowledged that when David had the girls on Thursday nights they would have to do

---

[2]The circuit court also conducted a hearing on a petition filed by Nela requesting a modification of David's child support obligation in light of his increased income.

homework and other activities related to preparation for the next school day. According to Nela, when she lived with David, she was 100% responsible for caring for the girls, including hygiene, medical, school, and extracurricular activities. David played with the girls in the evenings after work and helped bathe one child at night.

¶ 18    Nela testified that it had been difficult for her to find work after the divorce because of her responsibilities in caring for the children, including taking them to appointments and activities after school. She told the court that she had not been able to find an employer that would allow her the flexibility she needed, and she did not have a support system in the area.

¶ 19    With respect to support, Nela explained that there were a "handful" of times when David helped her when she needed help but that there had been many times when she had asked him for help, and she really needed his help, but he had "not been there." For example, she testified that, at one point, she had obtained a job at Auto Zone. Three months after starting the job, she had to take a week off work because the children were home from school on snow days. According to Nela, she asked David to take some days off work to care for the girls, but he said "absolutely not."

¶ 20    Nela testified that she had to leave the Auto Zone job when the children got out of school for the summer because she could not afford to put them in day care while earning minimum wage. According to David, Nela never told him that she wanted to keep her job at Auto Zone and did not ask him if they could work out a summer schedule for the girls that would have allowed her to keep her job.

¶ 21    As further example of her employment struggles and lack of support in Illinois, Nela testified that in 2015, H&R Block hired her near tax season as a bilingual receptionist/interpreter. Nela spoke fluent Spanish, but the job required "a few" days of training. According to Nela, one

of the daughters came down with strep throat and she asked David if he could take off work to care for the child so she could complete her training. Nela testified that David's response was that he could not miss work; therefore, Nela testified, she lost the job. Nela told the court about working at a "temp agency," but that position was only a four- to five-week contract position. Nela testified that, at the time of the hearing, her only income was money that David paid her from his military pension (approximately $300 per month) and child support.

¶ 22    Nela testified that, in North Carolina, she would have greater support that would allow her to work at least part-time. She explained that she would like to work for a nonprofit organization in North Carolina that provides services to the Latin community in North Carolina. She believed that she could assist with Spanish translation; assist Spanish-speaking individuals in getting financial aid, getting their children in school, and finding doctors; and assist in teaching English. She testified that she would be available to work in the evening hours, with Ben being available to help with the children in the evenings. She testified that she had been a stay-at-home wife and mother for the past 16 to 17 years and that she wanted the opportunity to be able to do something other than being a mother and housewife.

¶ 23    Nela agreed that David was support "[t]o an extent." For example, the record includes emails between Nela and David on February 9, 2016, in which Nela asked David if he could watch M.W. so she could work on February 15 from 7:45 a.m. to 2 p.m. David responded "sure" and agreed to meet her at McDonalds at 7:45 a.m. on February 15 to pick up M.W. Nela also acknowledged that there were times when David helped her by picking up the children when she could not do so, but added that the "big moments" when he did not help "[stuck] out in [her] head."

8

¶ 24    As an example of one of these moments, Nela testified that in August 2015, she had to have two surgeries approximately two weeks apart. She needed to be at the hospital by 5:30 a.m. on the Mondays of the surgeries and needed someone over the age of 18 to take her home in the afternoon after the surgeries. At the time of the first surgery, the children were still on summer break, so she needed someone to watch the children on Monday as well as Monday night and all day on Tuesday while she recovered from the surgery. Nela asked David to watch the girls for those two days. She told him that she would schedule the surgery on a weekend he had visitation so he could extend his visitation time with the children. According to Nela, David told her that the girls could spend the nights with him, but he asked her to find a sitter during the day. According to Nela, after several email exchanges, she told David that she would take care of it. She then called her mother in Florida, who flew to Illinois and spent a week with the children to help during and after Nela's first surgery. Nela testified that her second surgery took place during the children's first week of school and that her mother came back to Illinois to drive the children to and from school while Nela recovered from the second surgery.

¶ 25    David testified that he would have loved to have the girls in the evenings during and after the surgeries. He explained, however, that he did not have any more days he could take off from work and that, in order to care for the girls during the day, he would have to miss work without pay. He testified that he told Nela that he did have some flexibility to make up a few hours of missed work and that if she could get a sitter for the children on Monday for four to six hours, he could leave work early and make up two to four hours by working longer on other days. He testified that he told Nela that if she could not get a sitter, he would take off from work to stay with the children.

¶ 26 Nela had told David that the babysitter they used was taking her to her surgery early in the morning and would wait to drive her home after the procedure, so she was not available to watch the children. David testified that he believed that Nela could get a second sitter for $10 an hour, but if he had to miss work, he would be docked $50 an hour from his paycheck. He admitted that he did not offer to pay for the second sitter but testified that he would have split the cost of the second sitter with Nela if she had asked.

¶ 27 Nela also told the court about an incident when M.W. had appendicitis. On Sunday, August 28, 2016, M.W. was sick. She was in extreme pain and throwing up. Nela took M.W. to an after-hours clinic and sent a text to David asking him to meet them there. David sent a text to Nela to tell her that he was out of town. He asked her to let him know what the doctor said. David testified that Nela did not ask for any help with their daughters at that time and had only asked him to meet them at the clinic. When Nela sent the text, David was at his girlfriend's house in the St. Louis area, 35 minutes from O'Fallon.

¶ 28 The doctor at the clinic believed that M.W. had constipation and directed Nela to pick up items at Walgreens, including an "orange liquid" and suppositories. Nela called David and told him about her conversation with the doctor but, according to David, she did not ask for any help. David testified that Nela told him that she was going to pick up "a few things" at Walgreens and then stay at home with their daughters the rest of the day. After leaving the doctor's office, Nela went to Walgreens and picked up the prescribed items.

¶ 29 Nela testified that when she got home from the clinic, M.W. was in extreme pain, was projectile vomiting, and had a fever. She testified that she needed someone to go back to Walgreens to get a different suppository and ginger ale. At approximately 11:30 a.m., Nela texted David, asking him if he could go to Walgreens and pick up the ginger ale and children's

glycerin suppositories. At that time, David and his girlfriend were at a festival at Tower Grove Park. According to Nela, she sent multiple texts to David asking for help, but he said he would not help.

¶ 30    Nela testified that she could not take M.W. with her to Walgreens because M.W. was on the couch doubled over in pain and kept throwing up into a pail. David told the court that Walgreens was a "few-minute drive" from Nela's apartment, so he told Nela to have S.W. look after M.W. for a couple of minutes while she ran to the store. Nela, however, testified that S.W. was not old enough to watch M.W. while she was gone and, in addition, that S.W. was sensitive to vomiting and was in her bedroom to keep away from M.W. Nela sent a text to David to explain that she could not leave M.W. because of her condition, and David responded by emphasizing that a trip to the store would only take her a few minutes, but that it would take him an hour and a half to get to the store from the festival.

¶ 31    Nela testified that around 2 p.m., her communication with David was cut off. David testified that, while he was at the festival, Nela texted multiple times, and he answered her texts, but at some point, his phone died.

¶ 32    M.W.'s condition worsened as the day progressed, and her symptoms included a spike in her fever. Nela took M.W. to a local hospital's emergency room. The doctors at the emergency room diagnosed M.W. with a ruptured appendix and arranged for an ambulance to take her to Cardinal Glennon hospital in St. Louis. Nela testified that she continued to text David and tried calling his cell phone but she did not receive any responses. She also testified that she did not have David's girlfriend's cell phone number.

¶ 33    David testified that when he got back to his girlfriend's house after they left the festival, he plugged his phone into a charger and then saw that Nela had texted and called. He explained

11

that he called her back, that she told him that she was in the emergency room at a local hospital in Illinois, that the doctors thought M.W. had appendicitis, and that they were transporting M.W. to a children's hospital in St. Louis. According to Nela, she did not hear back from David until around 7:17 p.m., after she was already at Cardinal Glennon hospital in St. Louis.

¶ 34    Both parties agreed that David arrived at Cardinal Glennon hospital shortly after he learned about M.W.'s condition and that he stayed at the hospital overnight and all day on Monday until after M.W.'s surgery. During cross-examination, David admitted that, in hindsight, he should have left to help with his daughter when Nela texted him but that he did not realize how sick she was.

¶ 35    Nela testified that she was always responsible for handling the children's medical care. She testified about an incident on Sunday, August 21, 2016, a weekend in which David had the girls. Nela usually picked up the girls at David's house at 6 p.m. on the weekends of his visitation. On that day, however, David sent Nela a text around 4:30 p.m., telling her that he would be at her house "in a few" to return the girls because one of them had a slight fever. Nela testified that sometime after returning the girls, David went to a restaurant in St. Louis with his girlfriend. Nela testified that the sick daughter was not able to attend school the next day. She was able to care for the sick daughter at home because she was not working. She testified, however, that she texted David Sunday evening after he dropped the children off to ask him if he could take the other daughter to school the next day. She said that she sent several text messages but never got a response.

¶ 36    Both parties testified about the breakdown of the relationship between David and S.W. that occurred in the fall of 2015 through the spring or early summer of 2016. The issues between David and S.W. began with an argument between them at church that ultimately resulted in

12

David taking S.W.'s cell phone away and spanking her. After the incident, S.W. refused to visit with David. He then had only short visits with S.W., for about an hour, in restaurants for lunch or dinner. During this time, M.W. continued with her regular visitation schedule with David.

¶ 37    David and S.W. attended counseling sessions together with Miller in an effort to repair the relationship. Nela and David both testified that, by the time of the hearing, David's relationship with both daughters was healthy and normal. Nela testified that she agreed to postpone a hearing on her relocation petition because of the issues between David and S.W. She explained that she wanted David and S.W. to work out their issues before the court decided whether she could relocate the children to North Carolina. She was concerned that David and S.W. would not be able to address their issues after they moved to North Carolina. At the time of the hearing, she believed that David and S.W. had resolved their issues and had repaired their relationship. She believed that David's parenting skills had changed after this incident in that he had learned to compromise with S.W. when conflicts arose, which was important with parenting S.W. due to her mild Asperger's syndrome. Nela testified that David never had any parenting issues with M.W. During his testimony, David agreed that his parenting style with S.W. changed after the incident and that he now seeks a compromise with S.W. when conflicts arise.

¶ 38    Nela presented evidence to show the differences between her apartment in O'Fallon and the house in North Carolina where she and the girls would live if they were allowed to relocate. Ben's house is located in a rural area in Marshville, North Carolina, which was approximately 18 miles from the edge of Charlotte, North Carolina. The home was 1800 square feet, had three bedrooms, and was on a 1¾-acre lot that adjoined two other lots owned by Ben's parents. Ben's parents lived in Florida but were constructing a home that would become their primary residence and would be located approximately 100 yards from Ben's home. Testimony established that

13

Ben's parents were moving to the property next to Ben in order to be closer to their grandchildren.

¶ 39    The yard at Ben's house included a trampoline and a swing set for the children and a shelter for six cats and some rabbits. Nela testified that the girls liked playing outside with the cats and that they were considering getting other animals. Nela testified that the girls' outdoor activities at Ben's house included riding four-wheelers, hiking, and camping. She felt that the children had more freedom at Ben's house in the country. She felt that the children could "run in and out" without jeopardizing their security. She did not have the same sense of security for the girls at her apartment in O'Fallon.

¶ 40    Nela also felt that the home was better for the girls because it had more square footage. In addition, they were planning on building onto the house so that each child (the girls and Ben's sons) would have their own bedrooms. She testified that if she remained in the O'Fallon area, she would not be able to afford her own home. Although she had $50,000 in savings from the divorce, she testified that she had put aside that money for college expenses and major emergencies. Also, she did not believe she would qualify for a mortgage.

¶ 41    Nela acknowledged that the girls have said that David's girlfriend is very nice and is good to them. She was fine with the girls spending time with David's girlfriend when they visited Illinois after the relocation. She also testified that she got along with David's parents and had no objection to them visiting the girls in North Carolina or communicating with them through Skype or calling. She agreed that the girls had a close relationship with David's parents and grandparents. During his testimony, David agreed that the girls had told him that Ben was nice and treated them well. He also agreed that the girls liked Ben's sons, that they had a good

14

relationship with them, and that he wanted them to spend time with each other. Ben testified that his sons got along very well with Nela, S.W., and M.W.

¶ 42    Nela testified that she believed that the move to North Carolina was in the girls' best interests because she had always been primarily responsible for their day-to-day care and they would benefit from seeing her in a loving marriage with Ben. She also believed that they would benefit from having stepbrothers to play with and grow up with and having Ben's parents nearby for extra support. She did not believe the girls would benefit from their mother having two households, one in Illinois and one in North Carolina. She believed that it was important for the girls to see a normal healthy marriage. In addition, she believed that the girls' lifestyle would be better living in a house in the country in North Carolina rather than in an apartment in O'Fallon, Illinois. Ben testified that if Nela was not allowed to move to North Carolina with the girls, it would be a financial hardship on them but that they would find some way to make their marriage work.

¶ 43    David testified that he believed that relocating the girls to North Carolina would adversely affect his relationship with his daughters because he would not be able to see them every week and would not be able to take part in all of their school activities. He was opposed to relocating his daughters to North Carolina because it would affect the time he had with them. He stated that he would not be able to see their school plays, watch them participate in spelling bees, or go to parent/teacher conferences. During her testimony, Nela agreed that if she was allowed to move to North Carolina with the children, David would not be involved with their school activities the same way he currently was involved. She testified that she consults with David concerning the children's extracurricular activities and would continue to do so after they moved to North Carolina.

¶ 44    David was also concerned that travel time would interfere with his time with his daughters. He was concerned that the relocation would adversely affect the bond he had with them because he would not see them every week like he did at the time of the hearing. He told the court that, if they were allowed to move, he would visit North Carolina as often as he could. He explained that "a couple of times" he could "possibly" use vacation time and visit his daughters in North Carolina during the months in which he did not have any extended holiday or summer visitation. He assumed that the girls' relationships with his family would not be affected if they lived in North Carolina because they usually saw his family when they traveled to Oklahoma on holidays or in the summer.

¶ 45    David testified that, if they stayed in O'Fallon, S.W. would go to a new ninth grade campus the next school year and would go to the main high school campus the following year. He agreed that this would be a change for her that would be challenging.

¶ 46    David testified that he did not have any plans to move from his house in O'Fallon to St. Louis, Missouri. However, LeChien testified that David had told him that he was going to live at his house in O'Fallon for a year or so and then was going to sell it. According to LeChien, David mentioned that his girlfriend was a high school teacher in St. Louis and that he was thinking about a move to Missouri. LeChien testified that David did not say he was going to move but that she "could tell by the way he asked the question that once he sold the house that was one of his options that he wanted to have was to move to Missouri."

¶ 47    According to David, he told LeChien that he was in a serious relationship and that he had discussed marriage with his girlfriend but had not discussed where they would live. He indicated to LeChien that he thought that he had to live in Illinois because of his children, and he asked her whether this was correct. He testified that his girlfriend had three more years of teaching before

16

she could retire with a full pension, so she had no plans on leaving St. Louis for at least the next three years. He testified, however, that he and his girlfriend had not discussed him moving to St. Louis.

¶ 48    David disagreed with Nela's testimony with respect to his availability for support, telling the court that he had been available for the "vast majority" of time when Nela had asked for help with the girls. He testified that the only time he had objected with helping with the children was when he did not have any vacation balance left. David testified that he had some disagreements with Nela concerning parenting style but agreed that she was a good mother.

¶ 49    LeChien testified that her recommendation was for the court to allow the girls to move to North Carolina while giving David as much time as possible, including three-day weekend visits, much of the summer, and the ability to visit the girls in North Carolina any time he is available for such visits. She believed that David could continue his close relationship with his daughters after the relocation with this parenting plan.

¶ 50    In her reports, LeChien concluded that David did not help with the girls' care and that Nela took care of the girls' medical issues. After hearing the parties' testimony at the hearing, however, LeChien testified that she believed that "David helped with the girls after hours, not during the day when someone would need to be at work."

¶ 51    At the conclusion of the hearing, the circuit court issued its ruling from the bench, granting Nela's request to relocate the children to North Carolina. The court noted that it typically did not make rulings from the bench but observed that it was important that the parties know its decision for the upcoming summer break and to have closure. The court was encouraged from evidence that Nela and David were not "backbiting at each other and sending

17

hateful emails and texts." The court believed that David and Nela would be able to continue to make joint parenting decisions after the relocation occurred.

¶ 52    The court acknowledged that the relocation would significantly impact David's relationship with the girls and recognized that there were "no good decisions in this case." The court believed that the parenting schedule after the relocation proposed by LeChien would provide David with longer stretches of time with the girls and that he could continue to talk to them on the phone and on Skype or FaceTime. The court felt that it would be good for the girls to live in a house with their mother, her husband, and their stepbrothers and close to their stepgrandparents. The court found that the relocation would not affect the children's visits with David's family in Oklahoma.

¶ 53    In explaining its ruling, the court noted that there were going to be changes to the girls' lives going forward regardless of whether they continued to live in Illinois or moved to North Carolina. The court also noted the difficulty that Nela would face in remaining in Illinois and trying to work while continuing to provide the parenting that she had traditionally provided to the children during the parties' marriage and after the divorce. The court expressed doubt that she would be able to keep a work schedule that would allow her to care for the girls. The court found that David did help with the girls, but not normally during work hours, stating that David had helped "when asked at times after work and on weekends." The court concluded that Nela did not have a sufficient support system in Illinois but would have the support she needed to seek at least part-time employment in North Carolina.

¶ 54    The circuit court found that both Nela and David loved their children and wanted what was best for them. The court did not find that either party was motivated by intent on making life difficult for the other. Nela wanted to live with her husband in North Carolina, and David wanted

18

to maintain his relationship and bond with his daughters. The court concluded that it was with "heavy heart" that it had to make the decision, but found that the factors weighed in favor of granting the motion to relocate.

¶ 55 On May 19, 2017, the circuit court entered a parenting plan setting out the parties' parenting time after the relocation. The circuit court granted David parenting time one weekend per month during the children's school year with the option of exercising his time on any three-day weekends during the school year. The court also granted David parenting time with the children in North Carolina upon 72 hours' notice. In addition, the court granted David parenting time during spring break, Thanksgiving and Christmas holidays, and most of the children's summer vacations. Nela was responsible for all transportation costs.

¶ 56 On November 15, 2017, the circuit court entered a 15-page order detailing specific findings pursuant to section 609.2(g) of the Marriage Act (750 ILCS 5/609.2(g) (West 2016)), relating to its decision to allow Nela to relocate the children to North Carolina. The circuit court also denied David's motion to modify his visitation/parenting time to allow him more parenting time in Illinois. David now appeals from the circuit court's judgment. David also challenges portions of the circuit court's judgment, which are discussed below, that awarded Nela attorney fees as sanctions against him and made its modification of child support retroactive to January 1, 2016.

¶ 57                                    ANALYSIS

¶ 58 The first issue we address is the circuit court's decision to grant Nela's petition to relocate the children to North Carolina and to deny David's motion to increase his visitation/parenting time in Illinois.

19

¶ 59    When Nela filed her petition requesting permission to relocate the girls to North Carolina, section 609 of the Marriage Act provided that a circuit court could grant a custodial parent leave to "remove" minor children from Illinois "whenever such approval is in the best interests" of the children. 750 ILCS 5/609(a) (West 2014). When the circuit court conducted a hearing on Nela's petition, the legislature had amended the Marriage Act by repealing section 609 and adding section 609.2 in its place. Pub. Act 99-90, § 5-15 (eff. Jan. 1, 2016). Section 609.2(g) sets out 11 specific factors that the court must consider when a parent who has been allocated a majority of parenting time seeks to "relocate" with the minor children. 750 ILCS 5/609.2(g) (West 2016). Like section 609, however, under section 609.2(g), the court's decision must be based on "the child[ren's] best interests." *Id.*

¶ 60    The enumerated factors set out in section 609.2(g) are as follows:

"(1) the circumstances and reasons for the intended relocation;

(2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

20

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." *Id.*

¶ 61 At the beginning of the hearing, the circuit court stated that it was going to apply the enumerated factors of section 609.2(g) in deciding whether it was in the best interests of S.W. and M.W. to grant Nela's petition, and neither party objected. We will also apply section 609.2(g) in evaluating the circuit court's decision in this case.

¶ 62 Before turning to the merits of the circuit court's decision, we want to note our agreement with LeChien's and the circuit court's astute observations that relocation cases are in the category of some of the hardest cases that a court has to decide. This is especially true in cases such as this one where both parents love their children and have been actively involved with their children's lives. Like the circuit court, we are also encouraged by the evidence that Nela and David are genuinely concerned with the best interest of their children. The record supports the circuit court's finding that David and Nela will be able to continue to make joint parenting decisions after a relocation.

¶ 63 Our review of the circuit court's decision is governed by well-established principles that apply when we review matters involving the best interests of minor children. Each case presents unique circumstances that require the trial court to determine what is in the best interests of a child on a case-by-case basis. *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988). We cannot

reverse a trial court's determination of what is in the best interests of a child unless it is contrary to the manifest weight of the evidence. *Id.* at 328. A court's decision is contrary to the manifest weight of the evidence only where the opposite conclusion is clearly apparent or where its findings are unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 343, 350 (2006).

¶ 64 In addition, the supreme court has instructed that " '[t]he presumption in favor of the result reached by the trial court is always strong and compelling in this type of case.' " *Eckert*, 119 Ill. 2d at 330 (quoting *Gallagher v. Gallagher*, 60 Ill. App. 3d 26, 31-32 (1978)). Such deference is required because the trial court had the opportunity to observe both parents and was able to assess and evaluate their temperaments, personalities, and capabilities. *In re Marriage of Kavchak*, 2018 IL App (2d) 170853, ¶ 65. We cannot reverse the circuit court's decision with respect to the best interest of the children merely because different conclusions could have been drawn from the evidence. *Eckert*, 119 Ill. 2d at 330.

¶ 65 With these directives in mind, we now turn to the statutory factors the legislature set out in section 609.2(g). The first factor in section 609.2(g), factor (1), concerns the circumstances and reasons for the intended relocation. 750 ILCS 5/609.2(g)(1) (West 2016). Here, the circuit court found that Nela was unemployed in Illinois and was unable to support herself and still care for her children. Her new husband, Ben, however, lived in North Carolina, had a lucrative career as an accountant, and owned his own home. The court did not believe that Nela was attempting to deprive David of time with the children by requesting to relocate. The court found that this factor weighed in favor of Nela's relocation request.

¶ 66 David challenges this finding, arguing that "there was no evidence presented that [Nela's] financial situation was impacting her ability to care for the children." We disagree. Nela testified

that her current apartment was "too expensive" and that she could not afford to buy a house for the girls in Illinois. She presented evidence of her struggles to find employment and evidence supporting a finding that she was unable to find long-term, full-time employment in the O'Fallon area while providing day-to-day care for the girls. The record supports the circuit court's findings with respect to Nela's motivation for seeking the relocation.

¶ 67     Factor (2) concerns the reasons why David objected to the intended relocation. *Id.* § 609.2(g)(2). The court noted that David loved his daughters and wanted to spend time with them on a frequent and regular basis. The court found that David did not have an ill motive in opposing the relocation of his daughters to North Carolina. Obviously, David does not challenge the court's findings with respect to this factor. We agree with the circuit court that David objects to the relocation out of genuine love for his daughters and concern that the relocation would negatively impact his relationship and bond with his daughters.

¶ 68     Factor (3) concerns the history and quality of each parent's relationship with the children and whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment. *Id.* § 609.2(g)(3). With respect to this factor, the court found that each party had "generally enjoyed a good relationship with each of their daughters." The court noted, however, evidence that David, at one point, had issues with his parenting of S.W., which resulted in the child's refusal to spend time with him. The circuit court did not find that David was a bad father because of this incident, but found it relevant that Nela was willing to postpone a hearing on her request to relocate so that issues between S.W. and David could be addressed. The court found, "[Nela's] willingness to wait an extra year before bringing the issue of relocation before this Court and her encouragement and support of the attempt to repair the relationship with David and his eldest daughter weighs in her

23

favor." The court concluded that this demonstrated her willingness to place the needs of the children ahead of her own needs and desires. The court concluded that David had since "developed the skills necessary to parent his eldest daughter" and that David would be able enjoy parenting time with each daughter while they reside primarily in North Carolina. The record supports the circuit court's finding that Nela supported the rehabilitation of David and S.W.'s relationship and demonstrated her placement of the children's needs ahead of her own.

¶ 69     The circuit court also noted that, although David filed a motion requesting more parenting time, "he never asked [Nela] for more parenting time with the girls." Instead, the circuit court found that Nela "asked David to spend more time with the girls so she could seek and maintain employment sufficient to support herself but he failed to provide any help in this regard unless it was at his convenience after his work hours or on weekends when he was not otherwise busy." As an example, the court noted that David refused to drive S.W. to school when M.W. was sick even though it could have allowed him time with S.W. and he could have accomplished this parenting task before work. The court found that "David's position seems to be that if it is [Nela's] parenting time, it is up to her alone to remedy parenting issues when they arise."

¶ 70     On appeal, David challenges this finding, arguing that he wanted to spend more time with his daughters. However, the circuit cited examples in which David had opportunities to spend more time with the children but he chose not to do so, and it is within the circuit court's province to make these findings, inferences, and conclusions from the evidence presented at the hearing. Although the record includes examples of occasions when David was willing to help by spending more time with the girls, our standard of review requires us to determine whether the record supports the circuit court's findings. Our task does not involve making alternative findings by

24

reweighing the evidence. The record supports the circuit court's finding that David did not take advantage of opportunities to spend additional time with the girls on some occasions.

¶ 71    Factor (4) concerns educational opportunities for the child at the existing location and at the proposed new location. *Id.* § 609.2(g)(4). The court found that the schools in O'Fallon, Illinois, and in Marshville, North Carolina, were comparable and that the children would continue to perform well academically wherever they go to school. This finding is neutral and is not challenged on appeal.

¶ 72    Factor (5) concerns the presence or absence of extended family at the existing location and at the proposed new location. *Id.* § 609.2(g)(5). With respect to this factor, the court noted that neither party had family in Illinois or the St. Louis metropolitan area. David had some family in Springfield, Missouri, but the majority of his family was in Oklahoma. The court noted that the children saw David's family in Oklahoma over Thanksgiving and that the relocation would not change this holiday visit.

¶ 73    The court noted that Nela's family lived in Florida and that Ben and his sons lived in North Carolina. The court found that Nela had no support in Illinois and could not count on David when typical problems or emergencies arose. The court, therefore, found that this factor supported a finding that it was in the girls' best interests to relocate to North Carolina with their mother.

¶ 74    Although the evidence in the record includes instances when David assisted Nela when she asked, the record also includes instances when David was unavailable to help for different reasons, often because of his work. The evidence in the record supports the circuit court's finding that neither party had family support in Illinois and that David was often unavailable to help with the children during working hours.

¶ 75    Factor (6) concerns the anticipated impact of the relocation on the children. *Id.* § 609.2(g)(6). Here, the circuit court acknowledged and was very much aware of the anticipated impact involved in relocating the children away from their father. The court was concerned with David's relationship with his daughters and fully understood that his parenting time with the children would change upon granting Nela's relocation request. The circuit court believed, however, that the parenting plan proposed by LeChien "ensure[d] that David and his daughters [would] have regular and frequent periods of time together," including "one weekend per month, every Spring break, every Thanksgiving, most of the Christmas break, and most of each Summer." The court noted that Nela was required to pay all transportation costs and that David would see his daughters in Illinois "at least the same number of days, or more days than, he was awarded after the divorce trial." The court also noted that the impact on the children's education was minimal because they would have been changing schools even if they remained in Illinois.

¶ 76    On appeal, David argues that the circuit court failed to engage in any in-depth analysis of the impact on the children. We disagree. We believe that the record supports the opposite conclusion. The court carefully weighed the different and competing concerns and ultimately concluded that the benefits of relocating the children outweighed any potential negative impact. The court entered a parenting plan that was designed to preserve David's relationship with his daughters, and the court felt comfortable with the parenting plan in light of Nela's demonstrated commitment to fostering the girls' relationship with their father. The record supports the circuit court's thoughtful evaluation of this difficult factor.

¶ 77    Factor (7) concerns the ability of the court to fashion a reasonable allocation of parental responsibilities between the parents if relocation occurs. *Id.* § 609.2(g)(7). The court noted that although Nela and David shared joint decision-making authority, Nela had been responsible for

making all of the children's medical appointments and taking them to their appointments. The court found that she had been responsible for getting the children to and from school and extracurricular activities. The court found, "The tradition of the parties' parenting of the girls has been that [Nela], as a stay-at-home mother, has been responsible for the girls' day to day care. This will not change with the move to North Carolina. David has had input and that will not change." The court noted that David could participate in school conferences via telephone or Skype and that David testified that he had some flexibility in his schedule and income for travel so he could fly to North Carolina and partake in some academic and extracurricular events.

¶ 78    The court concluded that the proposed post-relocation parenting plan included "a viable schedule which will allow David to maintain his bond and relationship with his daughters." Again, the record supports these findings. The record includes evidence that Nela was responsible for the day-to-day activities of the children, and the circuit court was entitled to consider this evidence and conclude that a move to North Carolina would not cause a disruption in the allocation of parental responsibilities. We cannot second-guess this finding based on the record before us.

¶ 79    Factor (8) addresses the wishes of the children, taking into account the children's maturity and ability to express reasoned and independent preference as to relocation. *Id.* § 609.2(g)(8). Here, the court found that the children loved both parents and had decided not to choose sides or express a preference. The court concluded, therefore, that this factor is neutral and favors the position of neither parent.

¶ 80    David argues that M.W. expressed to LeChien that she did not want to move. The record includes LeChien's testimony about M.W.'s fears, including M.W.'s concern about making new friends and seeing her father. In making its ruling, however, the circuit court noted that the

27

children need to be parented and that they do not "get to make all the decisions in the relationship." In addition, LeChien ultimately testified that the children did not want to be involved in the decision-making process. The record, therefore, supports the circuit court's finding that this factor is neutral.

¶ 81    Factor (9) concerns possible arrangements for the exercise of parental responsibilities appropriate to the parent's resources and circumstances and the developmental level of the children. *Id.* § 609.2(g)(9). David does not challenge the circuit court's findings with respect to this factor.

¶ 82    Factor (10) directs the court to the minimization of the impairment to the parent-child relationship caused by a parent's relocation. *Id.* § 609.2(g)(10). In considering this factor, the circuit court again noted that the children's lives would be different regardless of whether it allowed or denied the relocation request. The court concluded that, without relocation, Nela would have to obtain full-time employment, which would change her role as a full-time homemaker. In addition, the court found that, with her limited work history and lack of skills, there were no employment options available that would offer the latitude to continue parenting the children as she had in the past. The court also noted that, according to Nela, since her spousal support had ended, she was no longer able to afford her current apartment that she shared with the children. The court concluded that David had been unwilling to provide Nela with flexibility when emergencies and unusual circumstances arose and that there were no other family members in the area to assist.

¶ 83    The court found that, in North Carolina, Nela would have Ben's support and would be able to parent the children as they were accustomed. The court noted Ben's testimony that his schedule was flexible and that he and his parents were available to provide support that would

allow Nela to pursue a part-time job. Again, as we have explained, the record supports these findings.

¶ 84    Factor (11) directs the court to consider any other relevant factor bearing on the children's best interest. *Id.* § 609.2(g)(11). With regard to this factor, the circuit court again noted that Nela's testimony "generally reflected that she had little support of any kind during her parenting time." The circuit court found it significant that Nela repeatedly called and texted David for help when M.W. was ill and subsequently had a burst appendix. The court found that Nela had repeatedly asked David to either pick up M.W.'s medication or sit with M.W. so she could pick up the medication but that he "simply refused to help" and made "impractical suggestions instead." The court found that, on this occasion, David chose to go to an outdoor festival with his girlfriend and ignored his phone or let his phone's battery go dead. The court noted that Nela had to handle the situation on her own, transporting the child to a local hospital, which then transferred her to a children's hospital in St. Louis due to the severity of the child's condition.

¶ 85    The circuit court also found it significant that David refused to provide childcare on the day Nela had to have surgery. The court found that Nela had to hire the children's babysitter to drive her to the surgery and had to fly her mother in from Florida to care for the children due to David's failure to offer support. The record supports the circuit court's findings and conclusions drawn from this evidence. Again, we cannot reverse the circuit court's findings based on this evidence merely because it could have weighed this evidence differently.

¶ 86    After evaluating and making findings with respect to all of the enumerated statutory factors, the circuit court concluded that the relocation was in the best interests of the children.

29

For the reasons we have explained, we cannot reverse that conclusion in this case under the manifest weight of the evidence standard of review.

¶ 87     With respect to David's motion requesting more visitation/parenting time, the court made two findings. First, the court found that David had not "sustained his burden to show that a change in circumstances exists which would allow him to seek a modification" of the visitation schedule established at the time of the divorce. Second, the court found that he had "not met his burden of proving that the modification that he [sought] would be in the children's best interest."

¶ 88     On appeal, David challenges both findings. However, we believe the second finding is dispositive.

¶ 89     The circuit court may modify parenting time if the court finds, by a preponderance of the evidence, that the modification is in the children's best interests. 750 ILCS 5/610.5(c) (West 2016). As noted in detail above, we review the circuit court's determination concerning a child's best interests under the manifest weight of the evidence standard. *In re Marriage of Adams*, 2017 IL App (3d) 170472, ¶ 19.

¶ 90     Here, when the circuit court conducted its hearing, it considered evidence relevant to Nela's relocation request and relevant to David's request for more parenting time. The circuit court considered both requests in light of the best interests of the children. The court concluded that David had not established that modification of his parenting time was in the children's best interests and that Nela had proven that relocating the children to North Carolina was in their best interests. For the reasons we explained above in addressing the court's decision to allow Nela to relocate the children to North Carolina, we cannot reverse the circuit court's denial of David's motion to modify visitation/parenting time.

¶ 91    On appeal, David challenges many of the circuit court's findings by emphasizing evidence of specific incidents in which he did help Nela and which provided him additional time with the girls. However, his argument on appeal, in essence, asks us to reweigh the evidence and make alternative factual findings that the circuit court could have made from the evidence presented, but did not. As we have explained, the supreme court has directed us not to reweigh the evidence but only consider whether the court's findings are supported by the record.

¶ 92    We are not unsympathetic to David's position. The circuit court, likewise, recognized the difficulty of the decision it had to make with respect to the best interests of the children. The court gave careful, thoughtful, and thorough consideration to all the evidence presented by the parties in light of the factors relevant to the children's best interests. We find no basis in the record to second-guess the circuit court's decision to allow Nela to relocate the children to live with her in North Carolina or with respect to its denial of David's request for more visitation/parenting time in Illinois. Accordingly, we affirm that portion of the circuit court's judgment.

¶ 93    Next, David takes issue with that portion of the circuit court's judgment that awarded Nela attorney fees and costs as sanctions and that portion of the judgment that applied its child support modification retroactive to January 1, 2016. He argues that both awards were contrary to the circuit court's prior orders.

¶ 94    The attorney fees that the circuit court awarded as sanctions stem from litigation that occurred between the parties prior to the hearing on Nela's relocation request. Specifically, on July 8, 2016, the parties appeared in court for a hearing on issues stemming from David's efforts to sell or refinance the marital residence, Nela's share of David's military pension income, payment for an orthodontic bill for M.W., and Nela's motion to modify child support. At that

31

hearing, the circuit court entered an agreed order that resolved some of these pending issues. Importantly, the order stated that Nela was "*responsible for her own attorney fees incurred as of this date* [*July 8, 2016*] *related to child support, military pension, house, and orthodontic bill.*" (Emphasis added.) The record includes Nela's attorney's affidavit of fees setting out her attorney fees through July 7, 2016.

¶ 95 The litigation between the parties stemming from these issues, and others, continued after July 8, 2016. The litigation included matters involving David's failure to comply with discovery, David's child support payable out of his 2014 and 2015 tax refunds, and additional hearings concerning David's obligation to sell or refinance the marital house.

¶ 96 On November 15, 2016, the circuit court entered an agreed order in which Nela and David agreed to $2300 per month in temporary child support. The court also ordered David to pay 28% of his 2014 and 2015 state and federal tax refunds for child support, which amounted to a total of $7517.16. The order stated that the court would enter a final order on child support after trial and after David produced his 2016 tax returns.

¶ 97 On January 10, 2017, Nela filed a petition for a rule to show cause for David's failure to pay her the $7517.16 that he was ordered to pay on November 15, 2016. She asked the court to order David to pay her attorney fees incurred as a result of his failure to comply with the November 15, 2016, order.

¶ 98 On April 3, 2017, Nela filed a motion asking the court to compel David to answer her discovery requests and award her attorney fees incurred in filing the motion.

¶ 99 On April 5, 2017, Nela filed a petition for rule to show cause, alleging that David failed to timely produce his 2016 federal and state tax returns. Again, she asked the court to require David to pay her attorney fees stemming from the filing of the petition.

32

¶ 100 On April 18, 2017, Nela filed a second motion to compel discovery, alleging additional discovery violations by David and again seeking attorney fees.

¶ 101 On April 25, 2017, prior to the hearing in this case on relocation and child support, Nela filed her position statement in which she set out, among other things, her position concerning attorney fees. Nela argued that David should pay $5513.13 in attorney fees, which represented "fees incurred as a result of David's failure to comply with discovery issues, issues regarding the refinance of the marital residence, and the cost of pursuing child support commensurate with statutory provisions from July 8, 2016 to present as an Order was entered on said date requiring *** [Nela] to be responsible for her own attorney's fees through July 8, 2016, for those issues."

¶ 102 Along with the position statement, Nela's attorney filed an attorney fee affidavit in which she testified that Nela incurred $2992.25 in attorney fees seeking David's compliance with discovery (some of these fees were incurred prior to July 8, 2016), $1597.25 in fees stemming from issues involving David's failure to sell or finance the marital residence after July 8, 2016, and $923.63 in fees seeking David's compliance with the court's order requiring him to pay $7517.16 in child support which were incurred after July 8, 2016.

¶ 103 Following the hearing on the contested issues, on May 19, 2017, the court entered an order addressing the "attorney fees requested by [Nela] from [David] related to discovery compliance, failure to comply with sale or refinance of marital residence, and payment of child support and expenses." The court ordered David to pay $2443.50 in attorney fees for discovery compliance issues, $1597.25 in attorney fees for issues associated with David's failure to timely refinance or sell the marital residence, and $923.63 in attorney fees due to David's failure to timely pay the child support arrearage from his tax refunds. These amounts totaled $4964.38 in attorney fees as sanctions against David.

¶ 104   On appeal, David argues that the circuit court improperly awarded fees and costs for discovery compliance issues that were incurred by Nela prior the July 8, 2016, order, arguing that the agreed order provided that each party was responsible for his or her own fees up to that date. However, we note that the July 8, 2016, agreed order stated that the parties had an agreement that each party would pay their own attorney fees and costs specifically related to "child support, military pension, house, and orthodontic bill" that were incurred up to July 8, 2016. The order does not state that the parties had an agreement with respect to attorney fees or costs incurred by either party for litigation over discovery compliance issues or with respect to any fees incurred by either party for any aspect of the litigation after July 8, 2016. Our review of Nela's attorney's fee affidavit shows that the circuit court's fee award included only fees for discovery compliance issues or, for other fees, only those incurred after July 8, 2016. Accordingly, the court's fee award was not contrary to the terms of the July 8, 2016, agreed order. We affirm that portion of the circuit court's judgment awarding Nela attorney fees and costs.

¶ 105   Finally, David takes issue with respect to that portion of the circuit court's judgment that orders modification of child support be retroactive to January 1, 2016. David argues that the circuit court's November 15, 2016, order, discussed above, "had resolved retroactive child support and only left open the setting of a final child support number at the final hearing on relocation on April 26-27." David argues, therefore, that "the trial court's retroactive child support order back to January 1, 2016, should be reversed." We disagree.

¶ 106   The circuit court's November 15, 2016, order specifically stated that it was a temporary order and that the final amount of child support that David must pay would be determined after a trial on the issue. Nothing in the November 15 order suggests that this temporary order was a

34

final determination with respect to any issue, including retroactive modification of past child support obligations. Nela correctly argues in her brief that the November 15 agreed order contemplated that "a further figure [would] need to be ordered after 2016 tax refunds [were] produced, indicating that the issue of retroactive child support for the entire 2016 calendar year had not been settled as no one knew what David's 2016 income would show when the November 15, 2016 agreed order was entered." The circuit court's modification of David's child support obligation, retroactive to January 1, 2016, was proper, and we affirm that portion of the circuit court's judgment.[3]

¶ 107                                                 CONCLUSION

¶ 108   For the foregoing reasons, we affirm the judgment of the circuit court.


¶ 109   Motion denied; judgment affirmed.

---

[3]David filed a motion in this court seeking leave to amend his notice of appeal to include his challenge to the circuit court's retroactive application of the child support modification. He filed the motion because the initial notice of appeal only included issues regarding the relocation of the children and attorney fees and costs that the court assessed against him. David's motion seeking leave to amend the notice of appeal is untimely under Illinois Supreme Court Rule 303(b)(5) (eff. July 1, 2017); therefore, we lack jurisdiction to permit an amendment to the notice of appeal. *Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.*, 137 Ill. App. 3d 550, 556 (1985); accord *Boyd Electric v. Dee*, 356 Ill. App. 3d 851, 857 (2005); *Alpha Gamma Rho Alumni v. People ex rel. Boylan*, 322 Ill. App. 3d 310, 313 (2001); *Heller Financial, Inc. v. Johns-Byrne Co.*, 264 Ill. App. 3d 681, 688 (1994). Accordingly, we deny David's motion for leave to amend his notice of appeal.

Nonetheless, we have addressed the merits of this child support issue without an amendment to the notice of appeal because the circuit court's decision with respect to child support was a step in the procedural progression leading to the judgment. See *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 433-36 (1979).

2018 IL App (5th) 170228

NO. 5-17-0228

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| MARIANELA WILLIAMS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 13-D-200 |
| | ) | |
| DAVID WAYNE WILLIAMS, | ) | Honorable |
| | ) | Julia R. Gomric, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

**Rule 23 Order Filed:** December 13, 2018
**Motion to Publish Granted:** December 27, 2018
**Opinion Filed:** December 27, 2018

_____

**Justices:** Honorable David K. Overstreet, P.J.

Honorable Thomas M. Welch, J., and
Honorable James R. Moore, J.
Concur

_____

**Attorney for Appellant** Jillian A. Wood, Stange Law Firm, P.C., 115 Lincoln Place, Suite 101, Belleville, IL 62221

_____

**Attorney for Appellee** Barbara L. Sherer, Sherer Law Offices, 205 North Second Street, Suite 102, Edwardsville, IL 62025-1632

_____