# Illinois Official Reports

## Appellate Court

---

### *In re S.R.*, 2014 IL App (3d) 140565

---

| | |
|---|---|
| Appellate Court Caption | *In re* S.R., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Tarah R., Respondent-Appellant). |
| District & No. | Third District<br>Docket No. 3-14-0565 |
| Rule 23 Order filed<br>Motion to publish<br>allowed<br>Opinion filed | October 31, 2014<br><br>December 11, 2014<br>December 11, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's decision to terminate respondent's parental rights was affirmed, since the record showed that respondent's son had resided in the same foster home since he was born, his foster parents provided for his safety and welfare, and they indicated that they wanted to adopt the child and provide permanency in his life, while respondent is unable, currently and likely ever, to provide any permanency; furthermore, nearly all of the statutory factors weighed in favor of termination. |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 12-JA-62; the Hon. Kirk D. Schoenbein, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Louis P. Milot, of Peoria, for appellant.

Jerry Brady, State's Attorney, of Peoria (Laura E. DeMichael, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE McDADE delivered the judgment of the court, with opinion.
Presiding Justice Lytton and Justice Wright concurred in the judgment and opinion.

**OPINION**

¶ 1     The circuit court of Peoria County found respondent, Tarah R., unfit to parent her child, S.R. The court also found it was in S.R's best interest to terminate respondent's parental rights. Respondent appeals, arguing the court's findings were against the manifest weight of the evidence. We affirm.

¶ 2     FACTS

¶ 3     On November 5, 2012, S.R. was adjudicated neglected on the basis that respondent suffered from schizophrenia and was currently in a nursing home. On June 28, 2014, the State filed a petition for termination of parental rights. The petition alleged respondent was unable to discharge her parental responsibilities and there was sufficient justification to believe that such inability to discharge parental responsibilities would extend beyond a reasonable time.

¶ 4     At the hearing on the State's petition, the State moved to admit the medical report of Dr. Terry Killian. Respondent's objection was sustained and the State continued the hearing to secure the in-person testimony of Killian. Ultimately, the hearing commenced on May 28, 2014.

¶ 5     The parties stipulated that Killian was an expert in the field of forensic psychiatry. Killian testified he interviewed respondent on June 26, 2012, at the Sharon Woods Health Care Center (the Health Center). At the time of the interview, respondent was residing at the Health Center. Killian testified that he was appointed to conduct a forensic psychiatric evaluation of respondent, which focused on four questions: (1) was respondent fit to stand trial in her pending criminal case, (2) were the previous mental diagnoses that respondent received correct, (3) was respondent fit to care for S.R., and (4) whether treatment could help respondent improve to the point where she could develop minimum parenting capabilities.

¶ 6     Killian testified that he reviewed the documents sent by respondent's attorney and respondent's medical history and had noted that respondent had previously been diagnosed with schizophrenia or schizoaffective disorder. He explained that schizophrenia is a biologically based severe and chronic mental illness, lasting "for a very, very long time, probably permanently." It involves deterioration in function, including becoming more

withdrawn and social interactions becoming more autistic, and experiencing hallucinations and delusions. Schizoaffective disorder is "essentially schizophrenia with some significant mood symptoms added, especially manic symptoms."

¶ 7 Killian testified that he interviewed respondent for about an hour and a half. Respondent was not very interested in the exam and repeatedly wished to stop it. Respondent stated her date of birth that was different from the one in her medical records. She did not know why the Department of Children and Family Services (DCFS) took S.R. away but believed that to regain custody, she only had to tell the judge that she was ready. She adamantly insisted that she did not have a mental illness and that she had never been diagnosed with one. Killian opined that if a person suffering from schizophrenia does not acknowledge the mental illness, he or she is unlikely to stick with treatment.

¶ 8 Respondent was unable to do abstract thinking or to name any recent presidents or states that share a border with Illinois. Killian believed respondent's IQ was near the normal range, but her performance was impaired by her psychiatric illness. Respondent had very flat emotional responses, which are associated with schizophrenia.

¶ 9 Respondent did not respond appropriately when informed that it was unlikely she would get her child back, merely saying "okay" in an unemotional tone. She left the interview twice to smoke and did not return until located by staff, appearing to be much more interested in smoking than in discussing how to get S.R. back.

¶ 10 Respondent's thought process was very disjointed, and she had a loosening of associations, "meaning that she would say one thing and then immediately make a comment that didn't seem to have any relationship to what we had been talking about, and bounce back and forth." She also made delusional comments, telling Killian that she had custody of her children and that they were all at home with a babysitter.

¶ 11 Killian confirmed the diagnosis of schizoaffective disorder. He based his opinion on the fact that respondent "has a long history of having schizophrenic-like symptoms with the delusions, hallucinations, poor functioning, and poor insight, had been hospitalized multiple times, [and] been found unfit to stand trial on the basis of her illness on three separate occasions, in 2002, 2006, and 2011."

¶ 12 Killian could not evaluate whether respondent had a personality disorder because she was far too ill for him to develop a sense of her underlying personality. Records showed that she had not been psychiatrically well enough in the last 10 to 12 years for anyone to really be able to assess her underlying personality. She had been found unfit to stand trial 10 years earlier, when she was in her late teens. Killian opined that it was very unlikely that she would regain fitness in the foreseeable future, if ever. He explained that a diagnosis of schizoaffective disorder does not automatically mean an individual would be unable to care for his or her children but, rather, would depend on the severity of the illness.

¶ 13 Respondent, in Killian's opinion, was "very, very much unable" to parent a child. Although such a conclusion is very unusual, Killian explained that respondent had a very prominent schizophrenic component to her illness, with some history of manic symptoms. Consequently, respondent was unable to perform most parental responsibilities. Killian could not imagine how respondent could be responsive to a child's needs given her total inability to connect with others. Additionally, to parent a child, respondent would have to live on her own

somewhere other than a facility like the Health Center. Killian explained this was unlikely since respondent never stayed with treatment unless she was in a facility where she was given her medications every day. Killian also did not believe that there was any treatment that could ever get respondent to the point where she could parent a child.

¶ 14 He acknowledged he had not had any contact with respondent since his interview with her almost two years earlier. At the time of the interview, respondent was taking prescription Zyprexa at a dose of 30 milligrams per day, and no new treatment had come out since the interview that would get respondent to the point where she could reasonably care for a child. Killian reiterated that he could not "imagine that at any point in her life she would improve unless some new miraculous medication came along." He kept abreast of treatments in development, and no such miracle drug was in the pipeline. Nothing anywhere in the foreseeable future could improve respondent to the point of her being able to parent a child.

¶ 15 Killian testified that the passage of two years without interaction with respondent had not changed his opinion. It was very atypical for him to say that someone would never be able to improve, but he gave that rare opinion in this case because it was so clear to him based on the severity of respondent's illness. Even if she was consistent with taking her medication, the high dose of one of the most effective antipsychotic drugs would still leave her unable to parent.

¶ 16 Upon the conclusion of Killian's testimony, respondent moved for a directed verdict, asserting that the State failed to present any evidence of her current medical condition. The circuit court denied her motion, finding that she had failed to present any evidence and had prevented the admission of updated medical records. Ultimately, the circuit court found respondent unfit.

¶ 17 The matter proceeded to a best interest hearing. The best interest report described S.R.'s foster placement. S.R. was two years old and had been in the same foster home since being released from the hospital following his birth on March 28, 2012. S.R. had never lived with respondent and had not visited with her since October 2012. The lack of visitation was "due to respondent's mental health issues and inability to perform basic parenting skills without significant prompting." S.R. had no bond or attachment with respondent. S.R.'s father was unknown.

¶ 18 According to the report, S.R. had bonded with the foster family. S.R.'s biological sister lived in the same home and had already been adopted by the foster parents. The foster parents loved S.R. and wished to provide permanency through adoption. The foster sisters and S.R.'s biological sister also wanted S.R. to become a permanent part of the family. S.R. loved the foster family and referred to them as his family. The foster parents had provided for all S.R.'s needs.

¶ 19 The circuit court found it was in S.R.'s best interest to terminate respondent's parental rights. In doing so, the court rejected respondent's guardianship request. The court held that S.R.'s attachments were with the foster family and that S.R.'s safety and welfare favored termination. These interests overruled any "wait and see" approach associated with an award of guardianship.

ANALYSIS

Respondent appeals the circuit court's order terminating her parental rights. Specifically, she contends the court's order finding her unfit due to her inability to discharge parental responsibilities was against the manifest weight of the evidence. She further contends that the court's order finding it was in S.R's best interest to terminate her parental rights was against the manifest weight of the evidence. We reject both of respondent's claims.

## Unfitness Finding

In reviewing a finding of unfitness, we consider the following:

"Under section 1(D)(p) of the [Adoption] Act [(Ill. Rev. Stat. 1989, ch. 40, ¶ 1501(1)(D)(p))], the State must produce competent evidence showing the parent has a mental inability sufficient to preclude her from discharging normal parental responsibilities. Second, the State must show there is sufficient justification to find the inability will extend beyond a reasonable time period. [Citation.] The standard of proof in a fitness case is clear and convincing evidence. [Citation.] The circuit court's finding of unfitness will not be set aside on review unless contrary to the manifest weight of the evidence. [Citation.] 'The rationale underlying this standard is that the trial court's opportunity to view and evaluate the parties and their testimony is superior to that of a reviewing court. Accordingly, the trial court's findings should be given great deference.' [Citations.] A parent can be unfit without fault, as '[a] child is no less exposed to danger *** because his parent is unable rather than unwilling to give him care.' [Citation.]" *In re K.S.T.*, 218 Ill. App. 3d 431, 435 (1991) (quoting *In re Brown*, 86 Ill. 2d 147, 152 (1981)).

The record establishes the respondent has a mental inability sufficient to preclude her from discharging normal responsibilities. Killian diagnosed respondent with schizoaffective disorder and noted that she has been found unfit to stand trial on three separate occasions in 2002, 2006 and 2011–a period of 10 years. Respondent's insight, logic and judgment were poor. She did not understand why DCFS believed she was unfit to parent. Her emotional response was very flat. She denied having a mental illness. She suffered from delusions and was residing at the Health Center. She did not take her medication when she was outside and on her own. All these facts support Killian's expert opinion that respondent was "very, very much unable" to parent a child.

The record also establishes that respondent's inability will extend beyond a reasonable time period. Killian testified that "it was very unlikely [respondent] would ever improve to where she would be to a point where she would be able to parent." The facts discussed above also support this conclusion. Moreover, Killian specifically explained that the only way respondent would be able to conceivably parent a child would be if "some new miraculous medication came along"; however, no such medication was in the pipeline.

Respondent argues the above evidence was insufficient to establish unfitness because Killian's interview was only approximately an hour and a half in length and took place two years prior to the fitness hearing. We disagree. Killian acknowledged this time span and the length of the interview; however, these facts did not change his opinion in light of the fact that respondent's schizoaffective disorder was severe in both duration and its impact on her daily

life. Killian reiterated he could not imagine respondent caring for a child "at any point in her life." Lastly, we find it significant that respondent objected to the admission of updated mental health records.[1] Under the doctrine of invited error, a defendant may not request to proceed in one manner and later contend on appeal that the course of action was in error. *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001).

¶ 27                                          Best Interest Finding

¶ 28    Respondent next contends that the Americans with Disabilities Act (the ADA) (42 U.S.C. § 12132 (2006)) "applies in this matter and that a guardianship goal would be a reasonable accommodation while not penalizing respondent for having the illness she has."[2] At the outset, we note that the two cases cited by respondent (*In re Adoption of Gregory*, 747 N.E.2d 120 (Mass. 2001); *In re B.S.*, 693 A.2d 716 (Vt. 1997)) do not actually support her argument. Both cases expressly hold that the ADA does not apply to proceedings to terminate parental rights. *Gregory*, 747 N.E.2d at 125; *B.S.*, 693 A.2d at 720. We agree with the reasoning expressed by the court in *B.S.*:

> "[Termination] proceedings are not 'services, programs or activities' within the meaning of Title II of the ADA [citation]. [Citations.] Thus, the anti-discrimination requirement does not directly apply to [termination] proceedings.
>
> Even if the ADA applied to [termination] proceedings, there is no specific discrimination against disabled persons in the [termination] process. Mental retardation is not, by itself, a ground for terminating parental rights." *B.S.*, 693 A.2d at 720.

¶ 29    We now turn to the substantive question of termination of respondent's parental rights. The State must prove by a preponderance of the evidence that termination is in the best interest of the minor. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). The circuit court's best interest finding will not be disturbed unless it is against the manifest weight of the evidence. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 30    In this termination phase, all considerations of the parent yield to the best interest of the child. *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002). While we have great sympathy for a mother losing her child in circumstances which she bears no blame, the child, too, is without fault and is entitled to the protection afforded by the statute.

¶ 31    Whenever a "best interest" determination is required, the following factors shall be considered:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;

---

[1]The parties do not discuss the outcome of respondent's objection; however, it *appears* that the State ultimately withdrew its motion to admit after the circuit court announced it was likely going to sustain respondent's objection.

[2]The portion of the ADA invoked by respondent provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2006).

- 6 -

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments ***;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2012).

¶ 32 Here, S.R. has been in the same foster home since birth. According to the best interest report, S.R. has clearly bonded with the entire foster family. Further, the foster parents are able to effectively provide for S.R.'s safety and welfare. Significantly, the foster parents wish to provide S.R. permanency through adoption. Conversely, the record demonstrates that respondent is unable, at this time and likely ever, to provide S.R. with permanency. Virtually all relevant statutory factors weigh in favor of termination. Thus, we conclude the circuit court's decision to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 33 For the reasons stated, we affirm the circuit court's judgment.

¶ 34 Affirmed.