NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210049-U

NO. 4-21-0049

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 11, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.K., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Livingston County |
| Petitioner-Appellant, | ) | No. 19JA71 |
| v. | ) | |
| Mark Z., | ) | Honorable |
| Respondent-Appellee). | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed the judgment of the trial court that denied the State's
expedited petition to terminate respondent's parental rights because the trial
court's findings were not against the manifest weight of the evidence.

¶ 2    Respondent, Mark Z., is the father of M.K. (born March 2010). In December

2019, the State filed an amended petition for adjudication of wardship seeking to terminate

respondent's parental rights in an expedited manner. See 705 ILCS 405/1-2 (West 2018). In

November 2020, the trial court found M.K. was a neglected minor and respondent was an unfit

parent pursuant to section 1(D) of the Adoption Act. 750 ILCS 50/1(D)(g) (West 2018).

¶ 3    In December 2020, the court conducted a dispositional hearing and adjudicated

M.K. a ward of the court. However, the court denied the State's request to terminate

respondent's parental rights because it found (1) the Department of Children and Family

Services (DCFS) did not make reasonable efforts at reunification, (2) the State had not shown an

aggravating circumstance, and (3) termination was not in M.K.'s best interest.

¶ 4        The State appeals, arguing that the trial court's findings regarding (1) reasonable efforts and (2) aggravating circumstances were against the manifest weight of the evidence. We conclude that the trial court properly declined to terminate respondent's parental rights because the court found that termination was not in M.K.'s best interest.

¶ 5                                I. BACKGROUND

¶ 6                                A. Procedural History

¶ 7 In November 2019, the State filed a petition for adjudication of wardship, alleging in relevant part that M.K. was a neglected minor, as defined by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(2)(i) (West 2018)), in that respondent "inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes *** impairment of physical health[.]" The State further alleged that respondent created a substantial risk of physical injury and an environment injurious to M.K.'s welfare due to domestic violence. On the same day that the petition was filed, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of DCFS.

¶ 8        In December 2019, the State filed an amended petition requesting the court terminate respondent's parental rights because he was an unfit parent in that he "failed to protect the minor from conditions within her environment injurious to the minor's welfare, pursuant to 750 ILCS 50/1(D)(g) [(West 2018)]." The State further alleged it was in M.K.'s best interest to have respondent's parental right terminated and sought that determination on an expedited basis.

¶ 9        B. The Joint Adjudicatory and Parental Termination Hearing

¶ 10        In June 2020, the trial court conducted an adjudicatory hearing at which it also considered whether respondent's parental rights should be terminated because he was an unfit

parent as alleged in the amended petition. We note that a report of proceedings for the hearing does not appear in the record. The docket entry for that date indicates that the State presented the testimony of two witnesses and the court admitted into evidence (1) a DVD of an interview with respondent and (2) pictures of M.K. depicting bruising on her face.

¶ 11 In July 2020, the trial court conducted a continued adjudicatory hearing at which respondent moved for a directed finding on the issue of unfitness. The court continued the matter and allowed the parties to submit written arguments. In his brief in support of his motion for directed finding, respondent argued that the State had failed to demonstrate that aggravating factors existed to justify the expedited termination of parental rights and "there was no showing that reasonable efforts are inappropriate and unsuccessful."

¶ 12 The State responded that section 2-21(5) of the Act (705 ILCS 405/2-21(5) (West 2018)) controlled and set forth the procedure for expedited termination proceedings. At the adjudicatory stage, the State was required to prove (1) by a preponderance of the evidence that the child is abused or neglected and (2) by clear and convincing evidence that the parent is an unfit person. The State maintained that whether an aggravating factor existed and reasonable efforts had been made were issues to be proved at the dispositional or best interest stage of the expedited proceedings. The State explained, "Because this case is currently in the adjudicatory phase of the proceedings the State will make no further argument regarding reasonable efforts or aggravating circumstances and will merely assert that the State has every intention of providing such evidence at the appropriate stage of the proceedings: the dispositional/best interest hearing."

¶ 13 In November 2020, the trial court concluded the adjudicatory hearing and entered a written order finding that the State had proved by a preponderance of the evidence that M.K. was abused and neglected. The docket entry stated as follows: "Court finds that State has met the

burden of proof by preponderance of evidence and finds minor abused and that there is clear and convincing evidence that State has met the burden of proof on counts with mother and father." The court continued the case for a best-interest and dispositional hearing.

¶ 14                                 C. The Dispositional Hearing

¶ 15         In December 2020, the trial court conducted a dispositional hearing and considered whether it was in M.K.'s best interest to terminate respondent's parental rights.

¶ 16                                 1. *The State's Evidence*

¶ 17         Taylor McDonald testified that she was the caseworker on the case since it was opened in November 2019. McDonald testified that M.K. was involved in a prior termination case when she was three years old, seven years before the instant hearing. That case was opened because M.K.'s mother had substance abuse problems. Respondent stated to McDonald that, in that prior case, he completed domestic violence, anger management, and parenting services. The outcome of the case was that M.K. was returned home to respondent.

¶ 18         McDonald testified that throughout the entire life of the case, M.K. had been with her maternal grandmother, who wished to adopt M.K. McDonald stated that M.K.'s grandmother (1) provided for all of her material needs, (2) was with her every day, and (3) helped her go to school, doctor's appointments, and counseling. McDonald stated M.K. had a strong bond and relationship with her grandmother, and M.K. told McDonald that she wanted to remain in that placement.

¶ 19         McDonald further testified that M.K. was in school but the school was conducting e-learning. M.K. "has some acquaintances at school." Regarding ties to the community, McDonald stated that M.K. had a babysitter and friends in the neighborhood.

¶ 20         On cross-examination, McDonald acknowledged that since the beginning of the

COVID-19 pandemic, no parenting classes had been offered. Regarding "substance abuse or mental health programs, outpatient counselling," "[t]hey are doing everything virtually, assessments and everything." McDonald testified that she made a referral to "IHR" for respondent. (We note that IHR stands for the Institute of Human Resources, also known as IHR Counseling Services, which provides mental health and substance abuse services in Pontiac, Illinois.) McDonald agreed that respondent gets frustrated easily, is dyslexic, and has a hard time comprehending what he reads, all of which adds to his frustration. McDonald acknowledged she did not know whether respondent had access to the internet "but the virtual classes are usually over [a] phone call or Zoom." McDonald did not know if respondent was familiar with Zoom. (We note that "Zoom" is an online video conferencing program which requires an internet connection to operate.) McDonald stated respondent had not had any visitations with M.K. because there was a no-contact order from a criminal case that arose out of the physical abuse that opened the parental termination case.

¶ 21                              2. *The Respondent's Testimony*

¶ 22             Respondent testified that he had an eleventh grade education and had a hard time reading—including the things the caseworker gave him—because he was dyslexic. Respondent loved his daughter and wanted to remain in her life. Respondent stated he was willing to go to classes, take counseling, and do anything else DCFS wanted him to do, and he would "try my best as much as I can." Respondent stated that he had completed those services before when he first got custody of his daughter. Respondent said the process was difficult because of his dyslexia but with hard work he was able to do it and would be able to do it again.

¶ 23             Respondent stated that he lived "out of town this time" in Graymont, Illinois, which did not have any counselors or facilities where he could receive services. Respondent

stated it was difficult for him to get to Pontiac to take classes through IHR. Respondent testified that he had never done a "Zoom meeting" and did not even know what Zoom was. Respondent added that he recently got a new phone and was willing to try Zoom if his phone could operate the program.

¶ 24 Respondent admitted that he gets frustrated easily, which creates a problem, but he was willing to take direction from a counselor or teacher to learn better methods.

¶ 25 Respondent testified that when he got along with M.K., they enjoyed doing outdoor activities together. Respondent stated that M.K. was a good, loving, smart, fun child, but she also had problems. Respondent stated he believed he could deal with those problems, "but sometimes I think I need to work on myself, too." Respondent stated, "We need to bond a lot more. We need more time with one another." Respondent said he could discipline M.K. safely and would avoid corporal punishment as much as possible.

¶ 26 On cross-examination, respondent stated that he told his caseworker he was willing to engage in services and had asked for transportation to an appointment at IHR. Respondent did not understand what the meeting was for, and it caused him frustration, particularly because "I had to drive in illegally because I was trying my hardest to get there." (We note that the dispositional report stated that respondent had spent time in prison for driving on a revoked license.) Respondent was further frustrated because each time he went to IHR, someone there asked him questions about M.K. that respondent could not answer because he had a no-contact order.

¶ 27 Respondent agreed that he first met with McDonald over a year ago and at the meeting, he told her that he did not intend to engage in services because he had completed them once before. Respondent acknowledged that McDonald had told him "[f]rom day one" that he

needed to complete services. Respondent stated he tried to get into classes but he did not understand what "they" wanted from him and could not provide answers to their questions. Respondent stated that he had been to IHR three times. Respondent did not know what his appointments were for, whether to complete assessments or do counseling. Respondent stated, "I don't know what's going on over there. That's why I was getting frustrated because they kept telling me the same stuff over and over," and respondent did not understand any of it.

¶ 28 Respondent testified that he could deal with M.K.'s mental health and behavioral problems, although he also stated that "people" did not know what her problems were and they were still trying to figure it out. Respondent clarified that he "heard what they [diagnosed M.K. with]; but they keep throwing different stuff at her. So, I don't know." The State asked, "How are you going to deal with [M.K.'s] problems if you don't know what they are?" Respondent answered, "Well, it looks like I've got to go to counseling and figure that stuff out."

¶ 29 3. *Arguments of Parties*

¶ 30 The trial court asked the State for clarification on how to proceed given the dual purpose of the hearing: dispositional and best interests. The State said the best way to handle the issues was by addressing them separately and taking them in order. Regarding the dispositional hearing, the State requested a finding that M.K. be adjudicated a ward of the court, that DCFS had made reasonable efforts to prevent or eliminate the need for removal, and that respondent be declared unfit (for reasons other than financial circumstances alone) to care for, protect, or discipline the minor and that it was in M.K.'s best interest for custody and guardianship to be granted to DCFS.

¶ 31 Regarding the termination portion of the proceedings, the State recommended that it was in M.K.'s best interest to terminate respondent's parental rights. The State argued that

aggravating circumstances were present based on respondent's domestic abuse, which the State characterized as "a pattern."

¶ 32    As to reasonable efforts towards reunification, the State argued that reasonable efforts had been made because respondent (1) had completed identical services several years ago but still abused M.K., (2) stated multiple times he refused to participate in services, and (3) had not started any services in the six months since McDonald made referrals. The State also argued that the statutory best interest factors all weighed in favor of keeping M.K. with her grandmother and against returning her to respondent.

¶ 33    In response, respondent argued that "the uniqueness and I think the risks attendant here being in substitute care I don't believe favors the State; and I think it favors denying the petition in this particular case." Respondent noted that the dispositional report painted a very different picture than the State. Far from "flourishing" in foster care, M.K. was "not making significant progress in therapy, continues to struggle with relationship permanency, unable to maintain friends because of bullying, often has outbursts and throws things, hits the foster parent, spits in her face. *** That to me is not a young lady that *** is flourishing in her current placement to me."

¶ 34    Respondent further argued that (1) the State had not demonstrated an aggravating circumstance and (2) the case was similar to any other physical abuse case. Respondent emphasized that the purpose of the Act was to reunify families when possible and argued that because M.K. and respondent both had problems, respondent should be allowed a fair chance to engage in services. Respondent was not familiar with technology and had transportation problems, both of which exacerbated his difficulties engaging in services because of COVID-19 restrictions. Respondent concluded that he thought termination was premature and not in M.K.'s

best interest.

¶ 35 Regarding the dispositional portion of the proceedings, the guardian *ad litem* (GAL) agreed that the State had met its burden that M.K. should be adjudicated a neglected minor and made a ward of the court. Regarding termination and the child's best interests, the GAL acknowledged that the State could "list off all the checkmarks." However, the GAL added the following, "I think a strong argument can be put forward in this particular case that there was never an attempt to reunify this family. There was never an attempt really to see what could or couldn't be completed. I understand that there was services that were offered in this particular case; and I understand that those services were not completed; but I can't say that there was a real attempt at reunification of this family." For those reasons, the GAL recommended that it was not in M.K.'s best interest to terminate respondent's parental rights.

¶ 36                                  4. *The Trial Court's Findings*

¶ 37 The trial court first discussed the State's arguments that aggravating circumstances were present. The court "d[id]n't think from a factual standpoint that this rises to the level of I'm going to say aggravating circumstances as argued by the State for a couple of reasons." First, the court disagreed with the State's characterization of the physical abuse. Instead of a "beating," the court found that respondent's actions constituted "excessive corporal punishment." Further, the court noted that the State was not proceeding on a theory of repeated abuse, of which the court further noted it had no competent evidence, just the two original instances.

¶ 38 The trial court agreed that there had not been reasonable efforts at reunification. The court noted that M.K. had problems dating back to before she was born and her mother used heroin ("And I see [grandmother] agreeing with me because she knows that I know a lot about

- 9 -

[mother]."). The court stated that there was not a reasonable effort to reunify the family and the conduct of respondent was not "so abhorrent and so aggravating that he is not entitled to at least an opportunity to correct that condition."

¶ 39    The court noted that respondent had learning disabilities, "really can't read; and that makes it extremely difficult for him; and I believe whenever he's been in court he's been respectful but obviously is limited in regards to his cognitive abilities to understand a lot of things that happen." The court believed that under those circumstances, it expected more help to be offered, but "instead we have him kind of flailing out there with COVID and everything is shut down. Nobody can for periods of time get into whatever type of services that they need."

¶ 40    The trial court found that respondent clearly had an interest in M.K., noted that respondent twice considered surrendering parental rights but ultimately decided not to, "and I think that's because he genuinely does not understand some of the stuff that's being thrown at him on a regular basis in connection with this case." The court continued, stating as follows:

    "So, I do not think this is a situation where early, or expedited termination is appropriate. I do think that *** the system made a decision to fast track this for termination; and all of the efforts and eggs were put in that basket and to the detriment of [M.K.] who now has zero relationship with her dad; and now we have a huge uphill battle to not only try to correct that relationship but also provide the services for dad so that he can hopefully reunify with his daughter.

    So, I do, I do not believe that the services that have been offered to date have been reasonable or geared towards a return home goal. I do believe as father sits there that h[e] is unfit and unable to care for the minor child and that the return or that the goal should be return home within 12 months."

¶ 41　　　　The trial court added that it was not addressing visitation because M.K.'s counselor needed to be consulted and communication figured out, stating, "And dad also hit the nail on the head because he understands that he also has his own issues to work on, and so this is a very good time for you to do that and focus all your efforts on that." The court warned respondent that if he did not start services quickly and was not engaged in them by the time the court held another permanency hearing, "we are back where we're at right now." The court admonished respondent that he needed to cooperate with DCFS, participate in services and referrals to correct the conditions that led to M.K.'s removal, and if he failed to make progress, his parental rights could be terminated.

¶ 42　　　　The trial court entered a written order in which it found that it was in the best interest of M.K. and the public that M.K. be made a ward of the court and adjudicated a neglected minor. The court further found respondent "unfit" and it was in the best interest of the minor to remove the minor from his custody. The court found that "reasonable efforts and appropriate services aimed at family preservation and reunification have not been made." The court placed guardianship and custody with the guardianship administrator of DCFS.

¶ 43　　　　This appeal followed.

¶ 44　　　　　　　　　　II. ANALYSIS

¶ 45　　　　The State appeals, arguing that the trial court's findings regarding (1) reasonable efforts and (2) aggravating circumstances were against the manifest weight of the evidence. We conclude that the trial court properly declined to terminate respondent's parental rights because the court found that termination was not in M.K.'s best interest.

¶ 46　　　　　　　　　A. Aggravating Circumstances

¶ 47　　　　As an initial matter, we conclude the State waived any argument that the trial

court erred by requiring the State to show aggravating circumstances to terminate respondent's parental rights at the dispositional hearing. To be clear, we fully agree with the State that no such showing is required. See *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 63, 70 N.E.3d 282. All of the necessary elements are set forth in section 2-21(5) of the Act. Nonetheless, at all times before the trial court, the State argued that it had demonstrated aggravating circumstances and failed to argue that it need not prove an aggravating circumstance. Indeed, in its brief to the trial court at the adjudicatory hearing, the State informed the court that evidence of aggravating circumstances should be considered at the dispositional hearing and the State intended to make such a showing.

¶ 48 The doctrine of invited error bars a party from requesting the trial court to proceed in a certain manner and later claiming on appeal that the trial court erred by following that request. *People v. Cox*, 2017 IL App (1st) 151536, ¶ 73, 89 N.E.3d 898. It is well settled that a party cannot complain of an error it injected into the proceedings, induced the court to make, or to which that party consented. *Id.*; see also *In re S.R.*, 2014 IL App (3d) 140565, ¶ 26, 24 N.E.3d 63. Generally, the State is subject to waiver and forfeiture the same as any other litigant (see *People v. Sophanavong*, 2020 IL 124337, ¶ 21), and we hold it to that standard here.

¶ 49 B. Requirements for Expedited Termination

¶ 50 Even if we excused the waiver, the outcome would be the same. As we explain, the trial court found that the State failed to prove an essential element in section 2-21(5)—namely, reasonable efforts at reunification—and that finding was not against the manifest weight of the evidence.

¶ 51 1. *The Law*

¶ 52 Section 2-21(5) of the Act provides the requirements that must be satisfied for a trial court to terminate parental rights at a dispositional hearing. In essence, that section provides

a road map for expedited termination proceedings in the trial court. That section provides as follows:

> "The court may terminate the parental rights of a parent at the initial dispositional hearing if all of the following conditions are met:
>
> (i) the original or amended petition contains a request for termination of parental rights and appointment of a guardian with power to consent to adoption; and
>
> (ii) the court has found by a preponderance of evidence, introduced or stipulated to at an adjudicatory hearing, that the child comes under the jurisdiction of the court as an abused, neglected, or dependent minor under Section 2-18; and
>
> (iii) the court finds, on the basis of clear and convincing evidence admitted at the adjudicatory hearing that the parent is an unfit person under subdivision D of Section 1 of the Adoption Act; and
>
> (iv) the court determines in accordance with the rules of evidence for dispositional proceedings, that:
>
> (A) it is in the best interest of the minor and public that the child be made a ward of the court;
>
> (A-5) reasonable efforts [at reunification] are inappropriate or such efforts were made and were unsuccessful; and
>
> (B) termination of parental rights and appointment of a guardian with power to consent to adoption is in the best interest of the child pursuant to Section 2-29." 705 ILCS 405/2-21(5) (West 2018).

¶ 53    In this case, the State filed an amended petition seeking termination in December

2019. At the adjudicatory hearing, the trial court first found M.K. was an abused and neglected minor by a preponderance of the evidence. Then, after considering that same evidence, the court determined that respondent was unfit by clear and convincing evidence.

¶ 54    At the dispositional hearing, the court needed to consider (1) whether it was in the best interest of M.K. and the public that she be made a ward of the court, (2) whether reasonable efforts at reunification were inappropriate or were made and were unsuccessful, and (3) whether termination of respondent's parental rights was in M.K.'s best interest.

¶ 55                    2. *Best Interest Finding*

¶ 56    The State complains that the trial court never made any findings about whether termination of respondent's parental rights was in M.K.'s best interests. However, the court essentially made that finding when it determined that reasonable efforts at reunification had not been made and that respondent and M.K. should have the opportunity to work towards reunification.

¶ 57    This court has long held that trial courts are not required to recite and evaluate every best interest factor either orally at the hearing or in a written order. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19, 8 N.E.3d 1258. "To the contrary, our law is clear that a trial court need not articulate any specific rationale for its decision, and a reviewing court need not rely on any basis used by a trial court below in affirming its decision." *In re Jaron Z.*, 348 Ill. App. 3d 239, 263, 810 N.E.2d 108, 127 (2004).

¶ 58    A reviewing court "will not disturb a trial court's decision that terminates an individual's parental rights at the best-interest stage of a combined hearing under section 2-21(5) of the Act unless that decision is against the manifest weight of the evidence." *In re N.B.*, 2019 IL App (2d) 180797, ¶ 43, 125 N.E.3d 444. A decision is against the manifest weight of the

- 14 -

evidence when the opposite conclusion is clearly the proper result. *In re Nylani M.*, 2016 IL App (1st) 152262, ¶ 48, 51 N.E.3d 1067.

¶ 59		Here, the trial court engaged in a lengthy and detailed discussion about the issues argued by the parties. Although the parties, and consequently the court, focused on (1) aggravating circumstances and (2) reasonable efforts at reunification, the court's discussion clearly sets forth—and supports—its conclusion that termination of respondent's parental rights was not in M.K.'s best interest. The trial court's determinations on these factors necessarily reflect its conclusion that termination of respondent's parental rights was not in M.K.'s best interest.

¶ 60		In particular, the trial court stated "unfortunately the delay [caused by COVID-19] only made things worse for the relationship between [respondent] and [M.K.]" The court repeatedly expressed frustration that "everything is shut down" due to the pandemic and both respondent and M.K. suffered as a result of their unique circumstances. The court also emphasized that (1) M.K. "has a lot of problems," (2) those problems stem from the mother using heroin while pregnant, and (3) those problems "go back much further than this incident." The court further emphasized that "[t]here's a lot of work to be done here," and respondent "clearly has an interest in [M.K.]." "So, I do not think this is a situation where early, or expedited termination is appropriate." "[A]ll of the efforts and eggs were put in [the expedited termination] basket and to the detriment of [M.K.] who now has zero relationship with her dad; and now we have a huge uphill battle to not only try to correct that relationship but also provide the services for dad so that he can hopefully reunify with his daughter."

¶ 61		In sum, the trial court expressed a clear belief that it was in M.K.'s best interest to have the opportunity for a relationship with and to return home to respondent. The court

recognized that respondent had difficulties but believed they could be overcome and classes could be completed. Additionally, the court emphasized that respondent had successfully completed services in the past and was hindered by a no-contact order from the criminal case, also before the same judge. Further, the court recognized that M.K. had many of her own difficulties which presented challenges for her grandmother. Given the uniqueness of these circumstances, the court concluded that it was not in M.K.'s best interest to terminate respondent's parental rights without further efforts at reunification. That decision was not against the manifest weight of the evidence.

¶ 62                    3. *Reasonable Efforts Towards Reunification*

¶ 63            Alternatively, the trial court's finding that reasonable efforts were not made was also not against the manifest weight of the evidence. In this case, respondent had stable housing, had successfully completed services in the past, and cared for M.K. for several years before she was removed from his care. The court expressed clear concern that respondent was not given a sufficient opportunity to engage in services due to (1) his dyslexia and resulting illiteracy, (2) lack of transportation, and (3) lack of availability of services due to COVID-19. The court believed that extra care was required from DCFS because it was clearly aware of respondent's literacy problems. The court also noted that DCFS should have been more helpful and diligent in helping defendant arrange services remotely because of the pandemic.

¶ 64            Certainly, DCFS had made some efforts, and the trial court considered the adequacy of those efforts. The court credited respondent's testimony that he did not know what was required and the DCFS was not explaining it to him in a way he could understand.

¶ 65            We give extra deference to trial courts when they consider competing versions of events and find one credible. See *In re Ta.T.*, 2021 IL App (4th) 200658, ¶ 57. The trial court is

in the best position to determine what was reasonable under the circumstances. *In re Jay H.*, 395 Ill. App. 3d 1063, 1070, 918 N.E.2d 284, 290. The court is intimately familiar with (1) the parties, (2) the locality, (3) conditions on the ground, etc. See *id.*; *Williams v. Williams*, 2018 IL App (5th) 170228, ¶ 64, 120 N.E.3d 167. At the dispositional and best-interest stage, the court is allowed to consider anything it finds helpful. *Jay H.*, 395 Ill. App. 3d at 1069-70. We do not substitute our judgment for that of the trial court or second-guess what information it determined was helpful and appropriate to consider because we are not in a position to do so. *In re Parentage of W.J.B.*, 2016 IL App (2d) 140361, ¶ 25, 68 N.E.3d 977.

¶ 66 The trial court's findings are abundantly clear that it believed respondent was unfit and M.K. should not be returned to his care. But the court was equally clear that it believed termination of respondent's parental rights was not in M.K.'s best interests because there had not been sufficient efforts towards reunification. Given this context and our highly deferential standard of review, we conclude that the trial court's findings at the dispositional hearing were not against the manifest weight of the evidence.

¶ 67 III. CONCLUSION

¶ 68 For the reasons stated, we affirm the trial court's judgment.

¶ 69 Affirmed.